UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 5: 21-099-DCR |
| ) | |
| V. ) | |
| ) | |
| DEANGELO DEVON GRANT, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Deangelo Devon Grant seeks to seeks to suppress evidence seized during a traffic stop occurring on August 16, 2021. The parties submitted briefs on the contested issues [Record Nos. 56, 57] and the Court held an evidentiary hearing on March 28, 2022.

Because Grant has failed to identify any valid basis for suppressing the evidence seized, his motion will be denied.

**I.**

On July 28, 2021, drug interdiction officers in Lexington, Kentucky intercepted a package containing approximately 26 pounds of crystal methamphetamine. While the box bore a shipping label with a fictitious New York address, it also contained an older label with the address of 440 Squires Road, Apartment 8212, in Lexington, Kentucky.

On or about August 16, 2021, interdiction officers advised the Lexington Police Department Narcotics Enforcement Unit that another suspicious package was being sent to the Squires Road apartment address.

Drug Enforcement Administration Task Force Officer Samuel Thomas Clements was the primary investigating law enforcement officer in this matter. During the March 28 evidentiary hearing, he explained that officers conducted surveillance outside the Squires Road apartment on August 16, 2021. There, they observed a male and a female subject (later determined to be Grant and co-Defendant Najai Imonni Anderson) enter apartment 8212. Upon exiting the apartment about 50 minutes later, Anderson placed a bag in the trunk of a black Dodge Challenger and then got into the driver's seat while Grant walked approximately 100 to 150 yards to the apartment complex's "mail facility." Anderson exited the parking lot, reentered, and then backed the Challenger to the mail facility.

TFO Clements later retrieved video footage from the mail facility. He observed Grant using a code to open the door of a storage container. Grant removed a box, sat it down, and walked out of the mail room and looked around. When Grant saw the Challenger, he picked up the box and carried it toward the vehicle. Although the trunk was slightly out of camera view, it appeared to Clements that Grant moved other items in the trunk and then placed the box into the trunk of the vehicle.[1]

TFO Clements and other officers who conducted mobile surveillance of the vehicle observed it travel from Man-O-War Boulevard and turn onto Richmond Road. Clements observed the vehicle which appeared to be speeding, maneuvering recklessly around other

---

[1] The details of Grant's retrieving and then placing the box containing methamphetamine in the trunk of the car being driven by Anderson was not known to officers at the time of the traffic stop. Therefore, this information is not included in the Court's analysis regarding whether law enforcement had reasonable suspicion and/or probable cause to conduct a traffic stop of the Dodge Challenger or whether a sufficient legal basis existed for the subsequent search of the vehicle.

vehicles, and making numerous lane changes without signaling.[2]  Clements relayed this information to other officers who were waiting nearby, including Kentucky State Police Master Trooper Mike King.  After a short pursuit, King initiated a traffic stop in his marked police cruiser, utilizing lights and sirens about 50 yards from a shopping center where the stop ultimately occurred.

As the Challenger was stopping, Defendant Grant immediately exited the passenger-side of the vehicle (and before the vehicle came to a full stop) with his hands raised, walked past one law enforcement vehicle and toward the second.  Grant was promptly handcuffed for the officers' safety and placed behind King's cruiser.  Grant was advised that he was not arrested but was being detained while officers completed their investigation.

KSP Trooper Jack Gabriel parked his vehicle in front of the Challenger in an attempt to stop further movement of the subject automobile.  As noted above, the driver, Defendant Anderson, was ordered from the car at gunpoint.  However, officers quickly determined that Anderson did not pose a threat to their safety.  She was not handcuffed but was asked to sit on a curb several feet from the car.  At one point, Anderson walked back to the car to retrieve her license.  At no point did Anderson attempt to shut the driver-side door of the Challenger, although she had ample opportunity to do so.

---

[2] The Court does not base its determination for the legitimacy of the traffic stop on the vehicle committing traffic violations by speeding due to the nature of the testimony presented on this point. However, the Court credits the testimony of TFO Clements that probable cause existed to conduct a traffic stop because of other violations, including several lane changes without proper signaling by the driver and the fact that the vehicle's windows were excessively tinted. The excessive window tinting supports the traffic stop and provides additional justification for the officers removing Defendant Anderson from the Challenger with guns drawn. The Court concludes that their actions at the time of the traffic stop were precipitated by all information available to them at that time. Due to the excessive tinting, officers were unable to view the driver or ascertain her actions until she exited the car.

In response to questions from the defendants, officers falsely advised Grant and Anderson that they thought the Challenger might have been stolen. Trooper Gabriel explained during the suppression hearing that, although the officers had a legitimate reason for stopping the vehicle, it made more sense to give the occupants of the vehicle a fabricated story (i.e., that the car may have been stolen) in light of the circumstances surrounding the traffic stop. As Trooper Gabriel explained, the manner and method used for stopping the vehicle was not typical for simple traffic infractions but would not be out of the ordinary for stopping a potentially stolen car.

During interactions with officers, Grant explained that the Challenger belonged to his aunt, while Anderson gave a contrary explanation (i.e., that the vehicle belonged to *her* aunt). After Anderson declined consent to search the car, Trooper Gabriel indicated that he was going to run his drug detection dog (Pluto) around the vehicle. According to Master Trooper King (and confirmed by the dash camera video), Grant became agitated after Troper Gabriel and Pluto began to perform the sniff check.

Trooper Gabriel and Pluto are certified as a canine team in narcotics detection, tracking, and patrol. Gabriel walked Pluto around the Challenger, beginning at the front area of the vehicle. Because the driver-side door remained open, Pluto briefly entered and aggressively alerted near the center console area with intensified sniffing and scratching. He did not alert to other areas of the vehicle. Based on Pluto's positive alert, Gabriel proceeded to search the vehicle. Upon opening the trunk, the officers discovered a large box containing multiple plastic bags with approximately 40 pounds of suspected methamphetamine inside.

Grant seeks to suppress this evidence, arguing that the officers lacked reasonable suspicion to conduct the traffic stop and lacked probable cause to search the Dodge Challenger.

II.

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. To properly effect a traffic stop, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Probable cause exists where the facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person in believing that the suspect committed, is committing, or is about to commit an offense. *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016). Reasonable suspicion, on the other hand, "is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). An investigative stop can ripen into an arrest if officers develop probable cause to believe that the defendant has committed a crime. *See Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999).

To warrant a *Terry* stop or detention, officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012). Courts consider the totality of the circumstances in determining if there is reasonable suspicion to initiate a *Terry* stop. *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011). In addition to requiring reasonable suspicion to initiate the investigative stop, the stop must be reasonable in scope. *Young*, 707 F.3d at 603.

Grant argues that the officers lacked any basis to stop the vehicle. However, TFO Clements testified that he observed the Challenger speeding and switching lanes without

signaling. Further, Clements and Gabriel both testified that the vehicle's window tint was excessively dark, a primary traffic violation in Kentucky. Police may lawfully detain a vehicle and make a brief stop of its occupants if there is probable cause to believe that a traffic violation has occurred, even if the offense is minor and the officer has additional subjective reasons for making the stop. *Whren v. United States,* 517 U.S. 806, 813 (1996); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle"). In this case, while officers told Grant a false story about believing the Challenger might have been stolen, probable cause for the stop existed based on the traffic violations observed by the officers.[3]

Police may use a drug-detection dog under these circumstances as long as the traffic stop and detention is not improperly extended. *See Illinois v. Caballes*, 543 U.S. 405; *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). And here, Trooper Gabriel and Pluto were

---

[3] While not necessary to resolve the issue presented, as the traffic stop was occurring, officers also had reasonable articulable suspicion that Grant and Anderson were involved in drug trafficking. This conclusion results from their surveillance of 440 Squires Road, Apartment 8212, which includes the interdiction of narcotics associated with that address occurring several days earlier. Notably, officers observed Grant walking to the "mail facility" and further observed the vehicle driving in a suspicious manner. As Master Trooper King testified, such conduct may be associated with vehicles transporting narcotics.

Next, Grant's behavior once the traffic stop occurred gave police additional reasons to suspect that he was involved in criminal activity. King's testimony and the video evidence presented during the hearing support the conclusion that Defendant Grant was attempting to distance himself from the vehicle carrying the methamphetamine. In addition to exiting the vehicle before it had come to a complete stop, placing his hands in the air, and moving toward the second police vehicle, he also disclaimed ownership of anything in the car except for a backpack located in the back seat area. And his several disclaimers occurred without questioning or prompting.

on the scene at the time of the stop. There is no suggestion that Grant's detention was unreasonably delayed.

Once a positive alert on the Challenger occurred, officers were authorized to perform a warrantless search of the vehicle. *See United States v. Lyons*, 687 F.3d 754 (6th Cir. 2012). After a positive alert from a drug dog, officers have probable cause to search a vehicle for controlled substances. *See, e.g., United States v. Winters,* 782 F.3d 289, 304 (6th Cir. 2015). "Such probable cause extends to every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Id*. In the present case, officers did not search the Dodge Challenger until after Pluto had a positive alert that the car contained controlled substances. Because a positive alert from a drug-sniffing dog provides probable cause to search a vehicle for narcotics, the officers did not violate Grant's Fourth Amendment rights by searching the vehicle following Pluto's positive alert.

Relatedly, Grant contends that Pluto should not have been permitted to sniff any portion of the car's interior. But contrary to his argument, officers had no obligation to close the driver's door that was left open prior to conducting the dog sniff. *See United States v. Puldo-Ayala*, 892 F.3d 315, 319-20 (8th Cir. 2018) (officers had no responsibility to close door; they simply took the situation as they found it); *United States v. Guidry*, 817 F.3d 997, 1006 (7th Cir. 2016) (finding that no Fourth Amendment violation occurred when dog instinctively stuck its head into an already open door); *United States v. Pierce*, 622 F.3d 209, 214-15 (3d Cir. 2010) (same); *United States v. Stone*, 866 F.2d 359, 363-64 (10th Cir. 1989) (same).

And while the police drew their guns before Anderson exited the vehicle, there is nothing to suggest that they did so for the purpose of gaining greater access for the search. In

large part, the officers conduct in removing Anderson was the result of the excessive window tinting and their inability to see inside the vehicle and observe Anderson's actions. Neither Grant nor Anderson were arrested at this time. Neither handcuffing an individual nor officers drawing their weapons automatically converts an investigatory stop into an arrest. *Smoke v. Hall*, 460 F.3d 768, 781-82 (6th Cir. 2006); *see e.g.*, *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005). "Officers are authorized to handcuff an individual during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo." *Valdez v. United States*, 58 F. Supp. 3d 795, 817 (E.D. Mich. 2014) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010)); *United States v. Slaughter*, 751 F. App'x 659, 662 (6th Cir. 2018) ("[D]uring *Terry* stops concerning narcotics transactions, officers are entitled – without probable cause – to remove suspects from a vehicle and place them in handcuffs as a precaution."). In fact, Anderson moved around freely and later returned to the Challenger to retrieve her license and again left the door open.[4]

Grant also makes the unsupported argument that the officers' search could not extend to a sealed container located in the trunk. However, an alert by a properly trained drug detection dog "is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). If the police have probable cause to search a lawfully stopped vehicle for contraband, they also have probable cause to search every part of it, including any containers therein in which the object of the search could

---

[4] Contrary to the argument contained in Defendant Grant's supporting memorandum [Record No. 57 at pp. 4, 12], Anderson had the opportunity to close the driver-side door. However, she simply did not do so.

be hidden. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991); *United States v.* Kelley, 459 F. App'x 527, 532 (6th Cir. 2012) ("[I]t is well settled that an alert from a trained dog provides probable cause for a search for drugs. . . . Further, the search based on such probable cause may be of the entire car, including the trunk."). Without question, the object of the search—controlled substances—could reasonably have been hidden in the container in the trunk.

Based on the foregoing analysis and discussion, law enforcement officers had probable cause to stop the vehicle occupied by the defendants on the date in question and conduct a search of its contents. Therefore, it is hereby

**ORDERED** that Defendant Grant's motion to suppress [Record No. 57] is **DENIED**.

Dated: March 29, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky